In the matter of the appeal from the decree of the Ocean
county orphans court admitting to probate a certain paper
writing as the last will and testament of J. EDWARD
CONOR.

[Submitted January 24th, 1923.   Decided February 15th, 1923.]

**Wills—Probate—Undue Influence of Testator's Wife—Lack of
Testamentary Capacity.**

*Mr. Ward Kremer* and *Mr. Ivan E. Maginn* (of the New
York bar), for the appellants.

*Mr. W. H. Jayne, Mr. H. H. Wainright* and *Mr. Terry
Parker,* for the respondents.

FOSTER, VICE-ORDINARY.

This is an appeal from a decree of the orphans court of
Ocean county, admitting to probate a paper purporting to be
the last will and testament of J. Edward Conor, deceased.

The will was executed in due form on June 3d, 1920, and
testator, then about seventy-four years old, died in Lakewood,
on April 23d, 1921, leaving him surviving his widow and
two married daughters, children by a former marriage, and a
stepdaughter.

The will was prepared and executed under the following
circumstances: Some time in May, 1920, testator was driven
from his home in Lakewood to the office of Mr. Wainright, in
Manasquan, where he gave Mr. Wainright instructions about
the preparation of his will and informed him of some of the
troubles he was having with his daughters.   Mr. Wainright,
some time later, dictated and had the draft of the will type-
written and in the course of a few days Mr. Conor called
again, the will was read to him, and he took it away with him
and some days later he returned with it and executed it in
the presence of Mr. Wainright and the latter's stenographer.
The will was then taken home by him, and Mr. Wainright

did not see the will again until the day Mr. Conor died, when it was given him by the widow. On each of these visits Mr. Conor was not accompanied by anyone and to Mr. Wainright he appeared competent and able to understand what he was doing.

The validity of the will is attacked on the ground of lack of testamentary capacity, produced by the excessive use of intoxicating liquors, and the habitual use of verinol by the testator, and on the further ground of undue influence exercised over testator by his wife, who is the principal beneficiary under the will.

The will disposes of an estate estimated of considerable value, and by its terms $1,000 is given to Mr. Sigler, a young friend and agent of the testator, and one dollar is given to each of the two daughters, who are the caveators. Nothing is given to the stepdaughter, Mrs. Pierson, and the residue of the entire estate is given to the widow, Iris Grace Conor.

The principal ground of attack against the will is based on undue influence and in support of this contention the evidence has established this situation. Testator's second wife, who has largely managed his business and affairs and who was the mother of Mrs. Whitmore and Mrs. Sanford, the caveators, died in October, 1918, shortly after the death of their son, who was in service, and thereupon testator began to drink very heavily, and his daughter Mrs. Sanford, then unmarried, continued to keep house for him in Lakewood, the other two daughters living in Brooklyn. The home at Lakewood was kept up until some time in April, 1919, when testator left it under the following circumstances: Mrs. Sanford had gone to the city for the day and while there she received a telegram from her father, telling her not to return that night; during the next three days she received similar telephone messages from him, and on the receipt of a telegram from a friend, she disregarded his messages and returned to Lakewood and found her father and the present Mrs. Conor drinking liquor in the pantry of the home, and she learned from them that this woman and another man and woman

were living in the house.  She ordered the party from the house and her father, at Mrs. Conor's persuasion, left with them, and they went to the Motor Inn, in Lakewood, where the party continued to live for about a month, and until they went to Atlantic City, on testator's invitation, and at his expense.  In the meantime Mrs. Sanford kept the home open, and one day her father called and said he was coming back, but he did not return to his home until after his marriage to the present Mrs. Conor, some months later, and after his daughter had married and left the home, to live with her husband.  With the exception of this call, Mrs. Sanford did not see nor hear from her father between April, 1919, and February, 1920, although they were both living in Lakewood during part of this period and she had written to him and telephoned to him, but was always told that he was not at home or was given some other excuse.  In February, 1920, she met her father on the street in Lakewood in a very intoxicated condition and she accepted his invitation to return and live at home, and she found Mrs. Conor and another woman living there with him.  She remained there three days; her father and the women were drinking liquor continually, and he was very nervous and could not sleep at night, and she was never given an opportunity to be alone with him. When she left to live with her sister, her father arranged to give her a weekly allowance of $15, to pay her board and clothing.  From the time she left the home in February, 1920, she did not see nor hear from her father again.  She did not know he was ill and she only learned of his death from a neighbor.

The presence of Mrs. Conor in Lakewood, in April, 1919, when Mrs. Sanford found her residing in her father's home, is accounted for and explained by the following facts:  At that time Mrs. Conor was the wife of one Sidney W. Arnott, a waiter, with whom she had lived without being married from 1911, when her first husband, a man named Harvey, divorced her, until 1915, when Arnott married her.  She was a common prostitute in New Orleans and in New York.

She was convicted in New York City of being a prostitute or as the keeper of a house of prostitution.

In the early part of April, 1919, accompanied by some woman, she went to Lakewood, and met Mr. Conor. On the night of April 13th, 1919, she returned from Lakewood to the room which she and Arnott occupied on West Eighty-fourth street, in New York City. She then told Arnott of meeting Conor and it was then agreed between them that she should get a divorce from Arnott on the ground of adultery with one Dorothy Gardner, then and now her intimate friend, so that she could marry Conor, whom she told Arnott and others was an old man with plenty of money, whom she could twist about her finger, and could get him to run away with her. She wanted Arnott to get her some morphine or atropine tablets to affect the old man's heart, and stated she would get some other sleeping potion in excess and make some use of it. It was further agreed at this time between Arnott and his wife that if he gave her free rein in the matter she would give him some money and a ticket to New Orleans, where they had previously lived, and whatever money she obtained from Conor was, as Arnott expressed it, to be split fifty-fifty between them. The following morning she told the landlady and another woman of her meeting with Conor—an old guy— as she described him, with a barrel of money, and who would do anything she wanted. In furtherance of the plan arranged with her husband, Mrs. Arnott, on the morning of April 14th, 1919, returned to Lakewood, without leaving the money or the ticket to New Orleans for Arnott and he did not see nor hear from her again until he met her in this court at the hearing of this cause, although in September, 1920, he learned she had obtained a divorce from him in Virginia, and in April, 1921, he wrote her under the name of Dowling, asking for money, and in reply he was called upon by two detectives, who he claims attempted to intimidate him as a blackmailer, and he then reached the conclusion that as his wife had double-crossed him, as he expressed it, it became his duty to help the Conor children obtain what belonged to them, and prevent her from getting the estate. While Mrs. Arnott and

Conor were living at Atlantic City, Conor asked her to marry him. She states she then told him her life history and informed him that she was the wife of Arnott. He urged her to get a divorce, so they could be married, and she agreed to do so, and she went to Virginia, where she instituted proceedings on August 19th, 1919, charging Arnott with having committed adultery with Dorothy Gardner. In the meantime she and Conor must have returned to Lakewood, for in June, and also in August, 1919, Conor held her out as his wife and she joined with him, as his wife, in executing and acknowledging before a notary in Lakewood five deeds conveying real estate in which he was interested. Her explanation of this is, that Conor held her out as his wife for his own protection, as he claimed "his children were framing him up to send him away," and she held herself out as his wife "because she felt sorry for him," but it does not appear that he had ever expressed any such apprehension about his children's treatment of him to any of his friends or business associates.

On September 26th, 1919, about five weeks after the commencement of her action, she obtained her final decree of divorce from Arnott, although the clerk of the court testifies the record shows the case had not then matured for hearing, and on the following day she and Conor were married in Virginia. The application for their marriage license was made by her; it was she who answered all the questions on the application blank, and stated her own age as twenty-seven and Conor's age as forty-five, when in fact it was seventy-two, and it was she who swore to the truth of the answers in this application and who paid the clerk his fee for the marriage license, and it was she who made all of the responses for herself and Conor in the marriage service, for Conor appeared to the license clerk and also to the minister at the time of the application for the license, and of the marriage ceremony, to be in a dazed condition.

After their marriage the couple continued to reside in Virginia for some time and it was during this period that Mr. Conor was told by someone that his daughters had broken

into his house in Lakewood and removed a large part of the furniture therefrom; that his daughter, Mrs. Sanford, was talking about his wife; that his daughters had purchased goods in the stores in Lakewood, amounting to nearly $4,000, and had charged the same to his account. As a result of this information and without personal knowledge of, or inquiry about, any of these matters, testator became very angry at his children; he stopped the weekly allowance of $15 he had been making to Mrs. Sanford; he terminated any credit his daughters had in the stores in Lakewood, and he caused to be published a notice in the Lakewood newspaper that he would not be responsible for debts contracted by his daughters, and he also had Mr. Wainright write to Mrs. Sanford to stop talking about his wife, and he gave instructions to have police guard his home, so that his daughters could not remove anything therefrom.

It does not appear from whom the testator received the information that incensed him against his children, although it does appear that only Mrs. Conor was living with him at the time in Virginia and was the only intimate he had and was apparently his only source of information and was the only one he consulted when he acted as stated upon this information. It also appears that all of this information was untrue, except the fact that Mrs. Sanford had been and was talking about his wife, and was angry over his marriage. The furniture that had been removed was the property of the step-daughter, Mrs. Pierson, with the exception of two paintings of the grandparents of Mrs. Sandford; and in effecting this removal, the house was not broken into, because Mrs. Sanford had the keys of the home and she and her stepsister had no difficulty in obtaining entrance to it; and the other daughter, Mrs. Whitmore, had no part in any of the matters mentioned. There is no proof that any or all of the children made purchases at the department stores amounting to $4,000, or any other sum, but there is proof, by stipulation of counsel, that Mrs. Conor made purchases at these stores, ostensibly as Miss Conor (Mrs. Sanford), and had the same charged to Mr. Conor, although she denies it.

Prerogative Court—In re Conor.

When Mr. and Mrs. Conor returned to their home in Lakewood he continued his excessive drinking and was intoxicated almost daily, and it also appears that he was encouraged in this dissipation by Mrs. Conor, and that he was nervous and resorted to verinol to enable him to sleep. In the latter part of May, 1920, three or four days before the will in question was executed, Mrs. Whitmore visited her father at his home and he was apparently glad to see her, and when she left he gave her a dollar for her children and a pie for her husband, and invited her to visit him again; a few months later she wrote him to learn if she could visit him and received no answer and never again heard from him, and she and Mrs. Sanford were refused permission by Mrs. Conor to see their father after his death unless and until they were accompanied by Mr. Muller, a neighbor. But on the night testator died Mrs. Sanford, notwithstanding Mrs. Conor's expressed wish that she should not call, having heard of her father's death, entered the home, without announcement, and found Mrs. Conor and several others drinking and laughing.

From what has been shown we have a situation where a weak, nervous man, advanced in years, dependent on some one to manage his business and affairs, is suddenly bereft by death of this support and assistance; to assuage his grief over the loss of his wife and son within a few days of each other, he seeks consolation in the excessive use of intoxicating liquors and sleeping potions; he becomes intoxicated almost daily; he is unable to sleep at night; he indiscriminately invites people into his home to drink with him, and while indulging in these excesses, with nothing but the ineffectual influence of his young unmarried daughter to deter him, he met the woman who is now his widow, and who with her husband had just conspired to obtain his property; his mental and moral condition is such that, notwithstanding this strange young woman informed him of her life of immorality, and that she was the wife of another man, he insists on marrying her; he goes further, he demands that she get a divorce from her husband; he leaves his home and unmarried daughter and lives for weeks with this woman as his wife; he represented her as

4

his wife when he knew, if he knew anything; that she was still the wife of Arnott; he had her join in executing deeds for part of his property, as his wife, before he married her and while she was still the wife of Arnott, and before she had any interest therein, and she actively aided and encouraged him in these various matters, if she did not actually suggest them.

Notwithstanding the opinion expressed by Mr. Wainright that testator appeared to understand the nature of the act he was engaged in when he executed the will, the proofs are convincing that testator had not acted in a rational manner nor as an ordinary, reasonable man from the date of the death of his former wife, on whom he had relied for the management of his affairs. This serious loss preying on a mind, apparently none too strong, and thereafter further weakened by the excessive daily use of liquors and drugs made him an easy victim to the machinations of this young woman, in straitened financial circumstances, who had determined to obtain his property for herself.

In furtherance of this design, and of the conspiracy which she and her husband, Arnott, had entered into for its accomplishment, and as evidence of the influence and control which she exercised over testator from the time she met him, we find her persuading him to indulge in the excessive use of liquor; she lives with him as his wife at hotels for months before they are married; she holds herself out as his wife, while still married to Arnott; she obtains the divorce from Arnott as planned and has testator on hand in Virginia, so that on the day following the granting of the decree he can marry her to complete the plan, without notice to his family or friends; she attends to all the details of the wedding; falsely swears to his age in the license application, pays the license fee and even relieved testator from making the customary responses in the marriage ceremony. Toward the completion of her scheme, after the marriage, she and testator continued to reside in Virginia for some time, instead of returning to his home in Lakewood, and while there testator's mind is so poisoned against his children by false and malicious information, that he becomes angry and condemns them and ceases all commu-

nication and relations with them; he deprives his younger daughter of her weekly allowance, her only means of support; he holds his children up to public shame by publication in the local newspaper; he places equal blame and the penalty of disinheritance upon Mrs. Whitmore, who had not even criticised Mrs. Conor, as Mrs. Sanford had done, and who was apparently in harmonious relations with him. On his return to Lakewood, either through indifference or incapacity, he made no effort to verify the information he had received, and when he met Mrs. Sanford on the street he apparently forgot his anger against her and invited her to come and live with him. His treatment of his other daughter was even more pronounced, if he was as angry against his children as the widow claims, for he had Mrs. Whitmore visit him while his will was being prepared, in which he disinherited her, and he then treated her with kindness and sent small presents to her husband and children.

The enmity between Mrs. Conor and Mrs. Sanford is not attempted to be concealed, and attention has been given this fact in the consideration of their testimony. Due consideration has also been given to all the parties and also to the sources from which the evidence in the cause has come, with the result that the facts recited are found to be clearly established, notwithstanding the complete and explicit denial that has been made by Mrs. Conor of any of them that are in any way injurious to her. And such denial on her part is shown to be untrue, by the clear preponderance of the evidence, by the peculiar circumstances of the case, by the testimony of disinterested witnesses on all essential features, and by the fact that the credibility of Mrs. Conor as a witness is seriously affected by the fact that she testified falsely in the orphans court that she had not been married before she married Arnott, although she admitted this marriage on the hearing in this court. In this court she at first testified falsely that she had not been a prostitute and not been convicted as such or as the keeper of a house of prostitution, although later when pressed on this point she admitted it. She further testified falsely that because of his treatment she had not lived with

Arnott after 1918, and did not know where he lived, when the facts show that they had lived together for months in New York City in 1918 and 1919, and until she went to Lakewood, and that she wrote to him twice from there in April, 1919, addressing him as "Dear Sidney."

She also insists she had no part in, or knowledge of. the preparation or execution of the will nor of its contents; that she had great affection for the testator and took no interest in his wealth or property. The utter falsity of this statement is shown not only by the fact that for years she and Arnott maintained a very unsatisfactory home on very limited means in a furnished room, but by the more significant fact that she knew where the will was kept, and that on the day testator died, and before he had received any attention from the undertaker, she had taken the will from his safe and delivered it to Mr. Wainright, whom she had requested to call on her for that purpose.

Such conduct cannot be considered consistent with her claim that she was disinterested in testator's wealth or property.

The truth of this matter would probably never have been learned if Mrs. Conor had kept her agreement with Arnott. If she had kept her promise to pay him money and give him half of this estate, the children of the testator would not, I am satisfied, from his appearance and conduct, have had the benefit of his testimony, such as it is, unless possibly they had paid him more than his wife had offered him. The widow's selfishness in attempting to get rid of him and to keep the testator's entire estate for herself has helped defeat her schemes. By disappointing and angering him, she has caused him to appear as a witness against her, and this animus on his part, which he freely admits, has been kept in mind in weighing the value of his testimony, which in many essential features is corroborated by the evidence of disinterested witnesses.

My conclusion from the evidence presented in this court, supplementing that offered in the orphans court, is that it is clearly shown that from the time testator first met the woman, who is now his widow, and until his death, he was continually

dominated, controlled and influenced by her in all his actions and relations, including the execution of this paper purporting to be his will, which he did not execute after its preparation, until he had taken it to his home where her dominating influence prevailed; and the exercise of this unfair and undue influence is further exhibited by the fact of the disinheritance of testator's children, because of testator's belief, based on false and malicious information, undoubtedly obtained from Mrs. Conor, of their alleged unfilial conduct.

The proofs, further convincing, show that this influence was exercised by Mrs. Conor over the testator in furtherance of the schemes she had concocted with her husband, Arnott, to obtain all of testator's property for herself.

The additions to the record, made by the evidence offered in this court, make it necessary for me to advise that the decree of the orphans court admitting this paper to probate be reversed, and that because of the undue influence exercised by his wife over the testator, this paper should be denied probate as his last will and testament.